

James C. Huber, Esq. (SBN 269488)
jhuber@attorneygl.com
**GLOBAL LEGAL LAW FIRM**
380 Stevens Avenue, Suite 311
Solana Beach, CA 92075
Telephone:  (888) 846-8901
Facsimile:  (888) 846-8902

Attorneys for Plaintiff,
U.S. ALLIANCE GROUP, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

U.S. ALLIANCE GROUP, INC.

    Plaintiff,

v.

NCR CORPORATION; and DOES 1 – 25, inclusive.

    Defendant.

Case No. 8:22-cv-00980 FWS(KESx)

Judge: Hon. Fred W. Slaughter

**FIRST AMENDED COMPLAINT**

## FIRST AMENDED COMPLAINT

Plaintiff U.S. Alliance Group, Inc. ("USAG") brings this action under Section 7 of the Clayton Antitrust Act, 15 U.S.C. §18, Section 2 of the Sherman Act, 15 U.S.C. §2, and for related business torts against Defendant NCR CORPORATION ("NCR") for damages and injunctive relief from NCR's anticompetitive and exclusionary practices, tortuous conduct, unlawfully maintaining a monopoly in the cryptocurrency ATM market, and to remedy the effects of this conduct.

## NATURE OF THIS ACTION

1.     This suit involves horizontal competitors in the ATM banking industry which encompasses ATM hardware and software services for electronic payment processing, ACH transactions such as conventional debit and credit transactions,

cryptocurrency ATM transactions, and related ATM management services for merchants and customers in banking, retail (grocery, supermarket, convenience stores and fuel), hospitality and restaurant businesses.

2.     For decades, the advent of the automated teller machine, ATM, revolutionized the field of banking and changed the way banks interact with their customers.  ATMs amplified the ubiquitous nature of banking allowing for a reliable easy interface for cash withdrawal and features such as ease of fund transfers, withdrawal, deposit, and 24/7 cash availability.  With advancements in technology, bank customers and consumers alike seek secure, faster, more convenient and reliable means of accessing cash which consumer demand catapulted the widespread adoption of ATMs globally.

3.     In the past decade alone, the computerized banking industry has grown exponentially into digital banking with the use of mobile apps and laptops for online banking services and the emergence of cryptocurrency, a form of digital or virtual money, commonly known as Bitcoin.

4.     Cryptocurrency, or virtual money, is driven by its utility as a novel method for transacting value in a digital world, exists independent of any financial institution and can be transferred globally without the need for a centralized third-party intermediary.  The combination of its technical features integrates and involves a wide array of participants and stakeholders offering hardware and/or software cryptocurrency payment processing services.

5.     In 2014-2015, cryptocurrency ATM machines entered the U.S. market allowing consumers to buy or sell Bitcoin and/or convert cash to cryptocurrency using an ATM machine as a faster and more convenient way to access Bitcoin than utilizing mobile apps or online cryptocurrency exchanges.

6.     NCR's recent billion-dollar acquisition of two companies, Cardtronics Inc. ("Cardtronics") and Moon Inc. dba LibertyX ("LibertyX") will lessen competition in the cryptocurrency ATM market, lead to higher pricing plans for merchants and

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

customers, higher ATM transaction fees charged consumers, and monopolize the cryptocurrency ATM market creating a barrier to entry to competition in the stakeholder chain.   Prior to NCR's acquisitions, USAG was under contract with Cardtronics and LibertyX, each a participant and stakeholder in the ATM market.

7.      Five years ago, in July 2017, USAG entered into an agreement with LibertyX, an emerging cryptocurrency ATM company.   Under their Merchant Processing Agreement, LibertyX granted USAG the "exclusive" right to manage LibertyX's electronic payment processing for its merchant ATM cryptocurrency transactions and a 5% interest in the company.  USAG was the "exclusive processing agent" and business advisor for LibertyX cryptocurrency ATM development.  USAG provided all of the introductions and groundwork for LibertyX to enter the ATM industry.

8.      Twelve years ago, since 2008, USAG had a renewing contractual relationship with Cardtronics, a leading global ATM software systems provider. Under their Payment Processing Agreement, Cardtronics provided USAG with frontend software services necessary to settle ATM transactions with the bank after a consumer makes an ATM transaction at a merchant location.

9.      USAG is informed and believes, and thereon alleges, that on or about January 2021, NCR, a prominent player in the global ATM market with an existing dominant ATM market share in the USA, knowingly orchestrated a scheme to disrupt, interfere, and end USAG's contractual alliances with LibertyX and Cardtronics, and to undercut and preclude USAG from continuing its contractual alliance with LibertyX as its exclusive payments processing agent for cryptocurrency ATM merchant accounts.   Part of NCR's scheme was to also preclude other entities similarly situated to USAG from competing in the marketplace.

10.     Between July 2017 and January 2021, USAG managed and developed a cryptocurrency ATM payment processing network of 28,484 cryptocurrency ATM merchant accounts for LibertyX under their exclusive, business advisory agreements.

11.    In 2021, NCR's predatory conduct was directed at USAG to accomplish NCR's purpose to achieve the company's new ATM-as-a-service strategic growth initiatives, to expand its software platform for electronic payments processing, and to enable NCR to enter the ATM cryptocurrency market.  It is no coincidence that NCR's predatory objective was to take the place of USAG and its contractual alliances with LibertyX and Cardtronics, the two companies uniquely postured in January 2021 to automate NCR's corporate strategy initiatives as "the world's #1 ATM Provider."

12.    In January 2021, NCR had the incentive and ability to exercise its existing ATM market power, and has the ability to maintain its monopoly power, to usurp and preclude USAG from its contractual alliances with LibertyX and Cardtronics and restrict its output.  NCR not only possessed the dangerous probability of success, but succeeded with its ultimate acquisition of both LibertyX and Cardtronics, the effect of which substantially lessened competition and created a monopoly and/or tends to create a monopoly in the cryptocurrency ATM market.

13.    NCR's anticompetitive acts and purpose are especially pernicious because its acts deny its competitors the ability to scale and compete effectively in the cryptocurrency ATM market by, among other things, offering supra-competitive pricing, bundling pricing plans, and consolidating all of the services typically performed by multiple entities, for ATM management services with ATM payment processing services for merchants, restaurants, retail storefronts, banks and financial institution customers strategically designed to create a barrier to entry by the competitors, like USAG that would also serve as a check and balance.

14.    NCR's market power, alone, as a dominant global ATM provider enables NCR the ability to maintain the monopoly which, by design, creates a barrier to entry for competition.  Further evidenced by BlackRock Inc.'s purchase of a reported 8.6% ownership of NCR's common stock with voting power, or 11,290,096 shares, on or about January 31, 2022.  BlackRock is reported to be the world's largest asset manager with US$10 trillion in assets under management as of January, 2022.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

15.   The cryptocurrency ATM market is a relevant antitrust market and an emerging niche market within the conventional AMT industry at large.  NCR, a dominant global ATM competitor financially backed by BlackRock, can easily maintain its monopoly and has cornered the cryptocurrency ATM market through its existing dominant ATM market power. NCR will continue executing its anticompetitive strategy to eliminate competitors, stifle the competition, cripple the competitive process, and, ultimately if not already, reduce consumer and customer choice, by monopolizing the ATM cryptocurrency market nationally and globally.

16.   Further, NCR's tortious interference and destruction of USAG's contractual alliances with LibertyX and Cardtronics perfectly illustrates NCR's ability to swiftly monopolize the market through acquisitions that reduce competition and restrict competitor output, which anticompetitive acts and purpose directly resulted in the diminution in value of USAG's assets, decline in its market capitalization, and other vested interests USAG had with LibertyX in the cryptocurrency ATM market.

## JURISDICTION AND VENUE

17.   This Court has jurisdiction pursuant to 28 U.S.C. §1332 as this action involves an amount in controversy in excess of $75,000, exclusive of interest, attorney fees and costs, and is between a citizen of a foreign state (NCR) and a citizen of this state (USAG.)

18.   USAG brings this action pursuant to Section 7 of the Clayton Antitrust Act, 15 U.S.C. §18, and Section 2 of the Sherman Act, 15 U.S.C. §2, the federal antitrust prohibitions on maintaining an unlawful monopoly or attempt to maintain an unlawful monopoly.

19.   This Court has subject matter jurisdiction over this action under Section 15 of the Sherman Act, 15 U.S.C. §15, and 28 U.S.C. §§1331 and 1337(a).

20.   This Court has personal jurisdiction over NCR; venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. §22, and under 28 U.S.C. §1391 because NCR is authorized to do business, and transacts business, within this

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

District and because a substantial part of the events or omissions giving rise to the claims occurred in this District, where NCR aimed its acts.

## THE PARTIES

21.     Plaintiff USAG is a California corporation with its principal place of business in Rancho Santa Margarita, California.  USAG is a leading national credit and debit card payments processor for merchants and provides cutting-edge electronic payment processing solutions for businesses.  USAG offers customers ATM machines, credit/debit card payment processing, ACH electronic transfers, cash advance, and cryptocurrency ATM processing services.

22.     NCR is a Maryland corporation, authorized to do business in California, with its principal place of business in Atlanta, Georgia.  NCR is a dominant global ATM service provider in the banking, retail, hospitality, and telecommunications industries providing end-to-end management of the ATM self-service experience including hardware, software, and technology services.  NCR has a reported 38,000 employees world-wide and manages an extensive customer base in established high growth global markets.  Prior to acquiring Cardtronics, NCR owned and operated approximately 100,000 ATM machines in the USA.

## NCR's ANTI-COMPETITIVE MONOPOLY AND MARKET POWER

23.     In the USA, there are approximately 450,000 ATM machines.  NCR, and its recently acquired wholly owned subsidiary Cardtronics, own 2/3 – or near 70% – of the ATM machines in the USA, with the remaining 1/3 owned by private operators or banks.

24.     Further, NCR is a prominent provider of – among other digital banking services –  ATM hardware and ATM management services operating in the global market.  NCR expressly represents to be "the world's #1 ATM provider."  See www.ncr.com/banking/digital-connected-services/atmaas (last viewed 06-01-2022.)

25.     NCR acquired Cardtronics on June 21, 2021, in an all-stock purchase valued at $2.5 billion to become the largest ATM company in the world.  As reported,

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

the board of directors for both companies signed-off on the acquisition.   See *Yahoo!*News,  MarketWatch  |  http://news.yahoo.com/ncr-acquires-cardtronics-2-5b-143410904.html. (last viewed 06-01-2022.)

26.    As part of its incentive and ability to close the acquisition deal, NCR paid a reported $32.6 million dollar cancellation fee on behalf of Cardtronics related to its then-pending acquisition agreement in December, 2020, with Apollo Global Management Inc.

27.    *Yahoo!*News further reported that, before the acquisition, Cardtronics was reportedly the world's largest non-bank operator and payments processing software provider; and NCR President and CEO, Michael Hayford, publicly acknowledged "that Cardtronics, with its more than 285,000 ATMS in 10 countries would expand his company's NCR-as-a-service strategy – a plan to service and secure existing [ATM] machines on a subscription basis."  Ibid.

28.    Prior to NCR's acquisition, Cardtronics was a leading ATM software system provider operating approximately 285,000 ATMs across four continents, approximately 200,000 ATMS in the USA, and a global leader in ATM software management systems.

29.    NCR next acquired LibertyX on January 13, 2022, in an all-stock purchase deal valued at $73,000,000.  See ncr.com | http://www.ncr.com/news/newsroom/news-releases/company/ncr-completes-acquisition-of-cryptocurrency-leader-libertyx (last viewed 06-01-2022.)

30.    NCR Executive Vice President & President, Don Layden, in the Payments & Network Division, touted LibertyX as "a leading cryptocurrency software provider" and "**a strong strategic fit for NCR because it accelerates NCR's ability** to rapidly deliver a complete digital current solution to [NCR] customers, including the ability to buy and sell cryptocurrency … and accept digital currency payments across digital and physical channels."  Ibid.

31.    "Accelerates" is an interesting choice of words, because USAG is

7

FIRST AMENDED COMPLAINT

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

informed and believes, and thereon alleges, that prior to NCR's tiered acquisitions of Cardtronics and LibertyX, NCR had absolutely no foothold in the cryptocurrency ATM market.

32.    NCR's Don Layden further opined that "[t]he LibertyX digital currency solution runs on ATMs, kiosks and point-of-sale (POS) systems today.  LibertyX partners with ATM operators, like NCR's Cardtronics, who owns and manages ATMS and the Allpoint network in the U.S. at locations like convenience stores, pharmacies, and supermarkets." Ibid.

33.    Don Layden's comment reflects NCR's privy to information, and deep understanding of, LibertyX's contractual relationships, including its exclusive agreements with USAG.

34.    USAG is informed and believes, and thereon alleges, that one of the main reasons that NCR tiered the acquisitions of Cardtronics and LibertyX was to obfuscate its anti-competitive acts and tortious interference with USAG's contractual alliances with LibertyX and Cardtronics, thereby, attempting to dilute NCR's apparent liability and shift some of the responsibility on Cardtronics.  In sum, NCR tried to avoid regulatory scrutiny by creating the appearance of two separate transactions, when in fact it was really one.

35.    NCR's predatory and anticompetitive acts are also revealed by the incontrovertible fact that NCR, with prior knowledge of USAG's agreements, did not notify USAG of its pending decisions to acquire Cardtronics and LibertyX.  Moreover, unbeknown to USAG, in March 2021 at the direction of NCR, Cardtronics surreptitiously "ported" proprietary software digital code keys from USAG for all 28,484 LibertyX cryptocurrency ATM merchant accounts to NCR, which misappropriation of business assets instantaneously restricted USAG's output. Cardtronics knowingly engaged in the "porting" process with a conscious commitment to the common anticompetitive scheme to usurp USAG's contractual alliance with LibertyX into a direct relationship with NCR.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

## USAG's AGREEMENT WITH CARDTRONICS

36.    On September 30, 2008, USAG and Cardtronics entered into an "Agreement for Processing Services" ("Agreement") which contractual relationship continued for over twelve (12) years.  After the initial four-year term, the Agreement automatically renewed for successive one-year terms.

37.    Under the Agreement, either party could terminate by giving "the other at least 180 days prior written notice of its intent to terminate [the] Agreement at the end of the Initial Term or any Renewal Term."  (Ex. 1, p. 4, par. 6.1.)

38.    Under the Agreement, USAG would refer merchant locations, from its proprietary merchant portfolio, to Cardtronics for ATM processing services.  The combination of USAG's and Cardtronics' services allowed for the conventional ATM machine to dispense cash, retrieve funds from the cardholder's bank, pay the ATM owner-merchant a percentage of the fees, and thereby complete the full ATM transaction.

39.    Specifically, Cardtronics would provide the frontend processing services which included the software necessary to settle the end-user, or consumer, ATM transaction.

40.    USAG would provide the ATM merchant-owner with the backend processing services by processing the transactions between the ATM machine and the bank, and then providing the ATM merchant-owner a statement reflecting the transaction.

41.    The Agreement in practice functioned by having USAG refer an ATM merchant location to Cardtronics, and Cardtronics would assign USAG a Terminal Identification Number, TID or software code "Key," that identifies the merchant to the ATM machine that the merchant used to process the ATM transactions.  The TID, or Key, specifies each ATM payment terminal a merchant business uses.

42.    USAG would then program the "Keys" into the ATM, which would allow the ATM to go live and fully process the end-user consumer ATM transactions.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

43.   USAG used its confidential login information to enter its proprietary merchant information related to the transaction into Cardtronics' customer relationship management software ("CRM".)  Cardtronics would then charge USAG a transaction fee for each consumer transaction on the ATM machine.

### USAG's AGREEMENT WITH LibertyX

44.   In July 2017, USAG entered into a Merchant Processing Agreement to provide ATM merchant and payment processing services to the then-emerging cryptocurrency group LibertyX.

45.   Under this Agreement, LibertyX granted USAG the "exclusive" right to manage its electronic payment processing; USAG was the "exclusive processing agent" for LibertyX.  (Ex. 2, p. 7, par. 1.1.)

46.   That same month, in July 2017, USAG began providing Cardtronics with USAG's proprietary LibertyX cryptocurrency ATM merchant accounts.

47.   As was customary under its Agreement with Cardtronics, for each new LibertyX account submitted, Cardtronics would assign USAG the software code "Keys" for the LibertyX Crypto-Merchant account.  USAG would enter that information in Cardtronics' CRM software system after which Cardtronics would then charge USAG a transaction fee for each consumer transaction on the Crypto-ATM machine.

48.   By January 2021, USAG had multiple agreements with LibertyX which included agreements granting USAG the right as the exclusive payment processing provider for LibertyX; granting USAG a 5% in LibertyX; and agreements for USAG to provide equipment, processing services, and advisor services to LibertyX.

49.   USAG was single-handedly responsible for, and developed, LibertyX's "Digital Coin" cryptocurrency business to 28,484 Crypto-ATM merchant locations, established its market presence, and facilitated the payment processing technology for LibertyX digital currency transactions.

50.   With USAG, LibertyX became a leading "Digital Coin" cryptocurrency

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

10

provider offering complete digital currency solutions to merchants, including the ability to buy and sell cryptocurrency, conduct cross-border remittance and accept digital currency payments across digital and physical channels, primarily via ATM machines.   With USAG, LibertyX operated over 28,000 cryptocurrency ATM machines that offered BitCoin transactions.

51.   After 12 years under contract with USAG, on March 15, 2021, Cardtronics suddenly stopped sending USAG reporting on all 28,484 LibertyX cryptocurrency ATM merchant accounts and was entirely unresponsive to USAG's requests for updates.   This breached Cardtronics' service obligations for payment processing in breach of its Agreement with USAG.

52.   Two days later, on March 17, 2021, USAG then received notice from LibertyX terminating most of its payment processing agreements and its exclusive service agreement.

## NCR's ANTICOMPETITIVE CONDUCT AND TORTUOUS INTERFERENCE

53.   USAG is informed and believes, and thereon alleges, that on or about January 2021, NCR had promulgated strategic growth initiatives to transform and expand its ATM electronic payments division, transform its merchant services into a software platform, and dominate and form a monopoly over the emerging cryptocurrency ATM market in the United States.

54.   As set forth above, Cardtronics and LibertyX were the ideal match for NCR to transform and expand its electronic payments software platform and to enter the cryptocurrency ATM market.

55.   USAG is informed and believes and thereon alleges that during the underwriting and acquisition process, NCR became aware and actually reviewed the agreements between USAG, Cardtronics, and LibertyX.

56.   At no time did NCR or Cardtronics provided USAG with prior notice of its pending acquisition agreement; or that Cardtronics had the intent to effectively

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

terminate its Agreement with USAG by knowingly engaging in parallel conduct to usurp USAG's contractual alliance with LibertyX.

57.    USAG is informed and believes, and is expected to have evidentiary support after a reasonable opportunity for further investigation and discovery, that in January 2021 NCR and Cardtronics coordinated with each other to actively conspire to usurp and destroy USAG's contractual alliance with LibertyX, to preclude USAG from continuing its exclusive agreement with LibertyX, restrict its output, and for LibertyX to begin processing its cryptocurrency ATM transactions directly with NCR and/or Cardtronics in order to gain a monopoly in the cryptocurrency ATM market.

58.    USAG is informed and believes, and based thereon alleges, that as a result of NCR's acquisition and predatory exclusive dealings, NCR and Cardtronics targeted USAG, discussed USAG agreements, and made a conscious commitment to a common scheme to overtake USAG's market presence in the cryptocurrency ATM space; and further for Cardtronics to leverage its relationship with LibertyX and eliminate USAG's vested interest in LibertyX.

59.    As set forth above, NCR's unlawful anticompetitive scheme first culminated in March 2021 with NCR directing Cardtronics' instantaneous "porting" of all 28,484 cryptocurrency ATM merchants from USAG's proprietary merchant portfolio into a direct processing relationship between Cardtronics and LibertyX.

60.    In furtherance of their common scheme, NCR directed Cardtronics to provide LibertyX with access to all of USAG's Confidential Information specifically for the purpose of enabling LibertyX to process payments direct with Cardtronics and unlawfully convert and misappropriate all of USAG's proprietary cryptocurrency ATM merchant information to NCR.

61.    USAG is informed and believes, and is expected to have evidentiary support after a reasonable opportunity for further investigation and discovery, that, prior to its acquisition, NCR knowingly aided and abetted and conspired with Cardtronics in exclusive dealings to divide markets, ATM products and electronic

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

payment processing services, including ATM-cryptocurrency transactions, merchants and/or territories between NCR and its subsequently acquired wholly owned subsidiary Cardtronics in the USA.

62.     NCR furnished the means to perpetrate this anticompetitive coup d'état, which unfair business practices, and acts taken in restraint on trade, directly resulted in the diminution in value of USAG's assets, decline in its market capitalization, and other vested interests in the cryptocurrency ATM market.

63.     As set forth above, on June 21, 2021, NCR acquired Cardtronics in a deal valued at $2.5 billion.  USAG is informed and believes, and thereon alleges, that this valuation was based, in material part, on eliminating USAG's interests in LibertyX and the subsequent acquisition of LibertyX agnostic of USAG.

64.     As set forth above, on January 13, 2022, NCR acquired LibertyX in an all-stock purchase deal valued at $73,000,000.  USAG is informed and believes, and thereon alleges, that this valuation was based, in material part, on eliminating USAG's vested interest and contractual alliance with LibertyX and the subsequent acquisition of LibertyX agnostic of USAG.

65.     Indeed, immediately following NCR's acquisition of Cardtronics in June 2021, NCR's banking revenue segment increased 40% for the fourth quarter of 2021; and immediately following NCR's acquisition of LibertyX in January 2022, NCR's Payment and Network revenue increased a whopping 1,259% for the first quarter of 2022 (compared to the first quarter of 2021 for the same segment) which revenue increase was the direct result of NCR's acquisition of Cardtronics and LibertyX, and eliminating USAG's role in the operation.

66.     NCR's Payment and Network revenue increase for the first quarter of 2022 was over 1,000% higher than any other NCR segment revenue increase for its business operations in the same quarter.

67.     Indeed, NCR's 2021 fourth quarter earnings, as reported, "[NCR] reported revenues of $2.03 billion, outpacing the consensus mark of $2.01 billion ...

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

[D]riven by contributions from the Cardtronics business, and solid growth across the company's banking and hospitality segments.  NCR progressed significantly with its strategic growth initiatives, which are transforming it into a software platform and payments company.  The company's recurring revenues improved 35% to $1.18 billion in the [fourth] quarter under review."  *Yahoo!*finance, Zack's Equity Research (February 9, 2022) http://finance.yahoo.com/news/ncr-corporation-ncr-q4-earnings-171005939.html.

68.   Further, as set forth above, NCR's anticompetitive conduct, and ability to maintain its monopoly power, is seen with NCR's ability to purchase, subsidize, and pay massive termination fees on behalf of Cardtronics, e.g. a reported $32,600,000, with NCR's global monopoly-driven profits that NCR knew were unavailable to its competition like USAG.

69.   NCR's conspiratorial scheme deliberately undercut USAG's contractual 5% interest in LibertyX and its vested business interests with LibertyX in the cryptocurrency ATM market and, as a direct result thereof, USAG suffered actual injury.

70.   Moreover, purchasing cryptocurrency typically requires an individual consumer register through a mobile app and/or online cryptocurrency exchange, undergo vigorous underwriting requirements, link bank accounts, and the process often incurs long wait times.  Some states restrict certain cryptocurrency apps, and many apps do not offer certain cryptocurrencies.

71.   The ease of use and fluidity of NCR's newly acquired cryptocurrency ATMs allow for instantaneous transactions without the cumbersome and time-consuming constraints of using mobile apps or online exchanges.

72.   By cornering the cryptocurrency ATM market, NCR has established an impenetrable stronghold, financially backed by BlackRock, an equity shareholder and the world's largest equity firm managing $10 trillion in asserts.  As a result, the competition in, and entering, this emerging niche market are significantly less likely

to have any long-term competitive significance or effect.

73.     USAG is informed and believes, and is expected to have evidentiary support after  a reasonable opportunity for further investigation and discovery, one or more of NCR officers, directors, executive management team members and/or agents, actively participated and orchestrated, knowingly authorized and/or ratified, the above stated breaches, anticompetitive monopoly business practices, and deliberate business interference with USAG's exclusive agreements and vested interest in LibertyX, USAG's proprietary cryptocurrency ATM merchant portfolio and established market share all to USAG's financial detriment and injury as well as injury to competition itself in the cryptocurrency ATM market; and further, such individuals are liable as provided for under 15 U.S.C. §24.

## FIRST CAUSE OF ACTION

### Intentional Inference with Prospective Economic Relations

### (Against Defendant NCR Corporation and DOES 1 – 25, inclusive)

74.     Plaintiff realleges and incorporates by reference each and every paragraph herein as though fully set forth below.

75.     USAG, Cardtronics and LibertyX were in economic relationships that were, and would continue to, result in continuing revenue stream and other economic benefits to USAG, like USAG's 5% vested business interest in LibertyX.

76.     Further, USAG had an "exclusive" Agreement with LibertyX and USAG was the exclusive payment processing agent for LibertyX.

77.     NCR knew, through its underwriting of the purchase of Cardtronics and LibertyX, of USAG's economic relationships with Cardtronics and LibertyX and knew that USAG had an "exclusive" contractual relationship with LibertyX.

78.     As set forth above, NCR knowingly orchestrated a scheme to usurp and destroy USAG's contractual relationships, unlawfully convert the economic relationships for its own financial benefit, and expand its market power and monopolistic gain to the exclusion and handicap of its competitors; and, further, knew

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

that its disruption of USAG's relationships was certain and/or substantially certain to occur.

79.     NCR deliberately interfered with USAG's prospective economic advantage in that, but for the illicit, anticompetitive, and unlawful acts as alleged herein, USAG would otherwise have continued to earn revenue, a residual income stream; and would have maintained its market share and vested business interests, and been able to continue business and develop its market share and business relationships with other third parties.

80.     As a direct result of NCR's tortious interference, USAG's economic relationships were disrupted and USAG was harmed, suffered injury and damages in an amount currently unknown but subject to proof at the time of trial.

81.     NCR's unlawful acts were reprehensible and despicable and carried on intentionally and willfully in conscious disregard of and with the intent to deprive USAG of money, property and legal rights and otherwise cause USAG injury, such as to constitute malice, oppression and fraud, entitling USAG to punitive damages in an amount appropriate to punish or set an example of NCR.

**SECOND CAUSE OF ACTION**

**Negligent Interference with Prospective Economic Relations**

**(Against Defendant NCR Corporation and DOES 1 – 25, inclusive)**

82.     USAG realleges and incorporates by reference each and every paragraph herein as though fully set forth below.

83.     USAG, Cardtronics and LibertyX were in economic relationships that did, and would continue, to result in a continuing revenue stream and other economic benefits to USAG, like USAG's 5% vested business interest in LibertyX.

84.     Further, USAG had an "exclusive" Agreement with LibertyX and USAG was the exclusive payment processing agent for LibertyX.

85.     NCR knew or should have known that these business relationships would be disrupted if NCR failed to act with reasonable care.

86.   NCR failed to act with reasonable care by engaging in wrongful conduct to substantially interfere with, undercut and destroy USAG's contractual relationships; and unlawfully convert the economic relationships for its own financial benefit, and to expand its market power and monopolistic gain to the exclusion and handicap of its competitors; and, further, knew that its disruption of USAG's relationships was certain and/or substantially certain to occur.

87.   As a direct result of NCR's tortious interference, USAG's economic relationships were disrupted and USAG was harmed, suffered injury and damages in an amount currently unknown but subject to proof at the time of trial.

88.   NCR's unlawful acts were reprehensible and despicable and carried on intentionally and willfully in conscious disregard of and with the intent to deprive USAG of money, property and legal rights and otherwise cause USAG injury, such as to constitute malice, oppression and fraud, entitling USAG to punitive damages in an amount appropriate to punish or set an example of NCR.

### THIRD CAUSE OF ACTION

#### Unlawful Conversion Business Assets

#### (Against Defendant NCR Corporation and DOES 1 – 25, inclusive)

89.   USAG realleges and incorporates by reference each and every paragraph above as though fully set forth below.

90.   USAG owned, possessed, and had a right to possess its business assets; and, more specifically, USAG's vested business interest in LibertyX, its exclusive LibertyX Agreements, the revenues generated from its contractual relationships, and USAG's proprietary merchant cryptocurrency portfolio to and including its proprietary pricing information and ATM merchant accounts, USAG's TID's to all LibertyX ATMS.

91.   NCR substantially interfered with USAG's exclusive Merchant Processing Agreements with LibertyX, by substantially interfering with its contractual relationship; and by intentionally and unlawfully exercising wrongful control over, and

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

taking possession of, all 28,484 LibertyX Crypto-Merchants from USAG, converted all 28,484 Crypto-Merchants into a direct relationship with Cardtronics, and further conspired to prevent USAG from having access to the proprietary periodic reports for LibertyX cryptocurrency ATM transactions.

92.     As set forth above, NCR tortious interference with USAG's business assets usurped and destroyed USAG's contractual relationship with LibertyX, to and including USAG's 5% interest in LibertyX.

93.     As set forth above, USAG demanded that Cardtronics, at the direction of NCR, stop interfering and restore the merchant accounts and services unlawfully taken from USAG, which breaches and interference Cardtronics denied, intentionally concealing from USAG its scheme with NCR to leverage LibertyX in its exclusive dealings with NCR.

94.     USAG did not consent to NCR's unlawful interference with USAG's exclusive Agreements and contractual relationships.

95.     As set forth above, NCR's unlawful conduct, and anticompetitive scheme to usurp USAG's business assets and market share for its own economic, financial, and market gain, was a direct and substantial factor that caused USAG harm.

96.     As a direct and proximate result of NCR's unlawful interference, USAG has suffered monetary damages in an amount currently unknown but subject to proof at the time of trial plus interest thereon at the maximum legal rate.

97.     NCR's unlawful acts were reprehensible and despicable and carried on intentionally and willfully in conscious disregard of, and with the intent to deprive, USAG of money, property and legal rights and otherwise cause USAG injury, such as to constitute malice, oppression and fraud entitling USAG to punitive damages in an amount appropriate to punish or set an example of NCR.

## FOURTH CAUSE OF ACTION

### Civil Theft of Property

### (Against Defendant NCR Corporation and DOES 1 – 25, inclusive)

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

98.    USAG realleges and incorporates by reference each and every paragraph above as though fully set forth below.

99.    Every person who feloniously steals or takes the personal property of another; or fraudulently misappropriates the property entrusted to him or her; or knowingly and designedly, by false or fraudulent representation or pretense, defrauds any other person of money, labor or personal property, and thereby obtains credit and/or fraudulently gets or obtains possession of money, or property, or obtains the labor or service of another, is guilty of theft.  Calf. Penal Code §484(a).

100.  Any person who has been injured by way of such theft may bring a civil action for three times the amount of actual damages sustained (treble damages), for costs of suit and reasonable attorney's fees.  Calf. Penal Code §496(c).

101.  As set forth above, in January 2021, NCR intended to deprive, unlawfully convert, and misappropriate from USAG its business assets and, more specifically, USAG's vested business interest in LibertyX, its exclusive LibertyX Agreements, the revenues generated from its contractual relationships; the TIDS that belonged to USAG related to merchant accounts, and USAG's proprietary merchant cryptocurrency portfolio to and including its proprietary pricing information and ATM merchant accounts.

102.  As set forth above, USAG, upon information and belief, and based thereon alleges, that NCR conspired with Cardtronics, and actively concealed from USAG its acquisition agreement with Cardtronics and exclusive dealings with Cardtronics, to stop doing business with USAG, leverage its relationship with LibertyX; exclude and handicap USAG, and other competitors, for its own economic and financial gain and to expand its market power and monopolistic dominance in the industry.

103.  USAG suffered monetary damages and losses as direct result of NCR's acts of theft by intentionally interfering with, unlawfully converting and misappropriating, USAG's business asserts which unlawful conduct permanently

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-9901

1   deprived USAG of its property.

2       104.   As a direct result of NCR's unlawful conduct, NCR is liable to USAG for

3   the actual damages suffered, for treble damages (three times the amount of actual

4   damages,) costs of suit, and reasonable attorney's fees.  Penal Code §496(c).

5       105.   NCR's unlawful acts were reprehensible and despicable and carried on

6   intentionally and willfully in conscious disregard of and with the intent to deprive

7   USAG of money, property and legal rights and otherwise cause USAG injury, such

8   as to constitute malice, oppression and fraud, entitling USAG to punitive damages in

9   an amount appropriate to punish or set an example of NCR.

**FIFTH CAUSE OF ACTION**

**Violation of the California Unfair Competition Law**

**(Cal. Business and Professions Code § 17200, et seq.)**

**(Against Defendant NCR Corporation and DOES 1 – 25, inclusive)**

14      106.   USAG hereby repeats and incorporates by reference each paragraph

15  herein as if fully stated herein.

16      107.   The California Unfair Competition Law is to protect competitors by

17  promoting fair competition in commercial markets for goods and services.

18      108.   As set forth above, NCR engaged in per se unfair and deceptive acts and

19  business practices by orchestrating a scheme, and in actively conspiring with

20  Cardtronics, to stop doing business with USAG, and undercut and destroy USAG's

21  contractual relationships with its merchant ATM accounts and customers and,

22  specifically, USAG's exclusive business relationship with LibertyX and competitive

23  presence in the ATM cryptocurrency market.

24      109.   NCR's deceptive acts and practices injured USAG.

25      110.   A causal link exists between NCR's deceptive acts, unfair and unlawful

26  practices, and USAG's resulting injury.

27      111.   Further, as set forth above, NCR unlawfully converted, intended to

28  deprive and fraudulently misappropriate from USAG its business assets and, more

specifically, USAG's vested business interest in LibertyX, its exclusive LibertyX Agreements, the revenues generated from its contractual relationship with LibertyX; the TIDS that belonged to USAG related to ATM accounts, and USAG's proprietary merchant cryptocurrency portfolio to and including its proprietary pricing information and ATM merchant accounts.

112.   NCR's unlawful conduct violates California's Unfair Competition Law because NCR's tortious interference proximately caused USAG actual injury, substantial monetary damage, lost business opportunity, and deprived USAG of the prospective economic benefit of its agreements.

113.   As set forth above, NCR has significant market power globally, furnished the means necessary to perpetrate the anticompetitive practices, and acted without a legitimate business justification in its refusal to deal with USAG, its competitor.

114.   NCR's unlawful practices also violate the Unfair Competition Law, because such acts offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious to consumers and competitors alike; and, upon information and belief, caused substantial harm, including artificially inflated prices and injury to competitors, which consequence greatly outweighs any possible legitimate business reason or justification.

115.   As a direct result of NCR's unfair and unlawful acts, USAG lost money, business assets, decline in market capitalization, and other vested interests in the ATM cryptocurrency market.

116.   USAG seeks, and is entitled to recover, injunctive relief, restitution, and disgorgement of profits.

## SIXTH CAUSE OF ACTION

**Horizontal Restraints-Allocation of Trade or Commerce in violation of the Cartwright Act,**

**(Cal. Cal. Business and Professions Code  §§16720, et seq.)**

**(Against Defendant NCR Corporation and DOES 1 – 25, inclusive)**

117.   USAG hereby repeats and incorporates by reference each paragraph herein as if fully stated herein.

118.   The NCRs agreements to purchase Cardtronics and LibertyX represent horizontal agreements entered into between NCR, LibertyX, and Cardtronics all of whom are competitors or potential competitors in the market for crypto-ATMs.

119.   Each of those acquisition agreements represents an agreement, trust, combination of capital, skill or acts by two or more persons, within the meaning of the Cartwright Act.

120.   Through these acquisitions, NCR has agreed to divide and cut out other ATM servicers and providers from the crypto-ATM space since NCR and Cardtronics own 2/3 of all ATM machines.

121.   By so doing, NCR have conspired to restrain trade in violation of the Cartwright Act. These market allocation agreements are per se illegal under the aforesaid provisions.

122.   The acquisition agreements of Cardtronics and LibertyX are anti-competitive.

123.   NCR has market power in the sale of all crypto-ATM transactions to individuals in California and the USA.

124.   Each of the challenged agreements has had substantial and unreasonable anti-competitive effects in the relevant markets, including but not limited to:

a. Reducing the number of payments providers competing with NCR throughout California;

b. Unreasonably limiting the entry of competitor crypto-ATM companies into California;

c. Allowing Defendants to maintain and enlarge its market power throughout California;

d. Allowing Defendants to raise the premiums charged to consumers by artificially-inflated, unreasonable, and supra-competitive amounts;

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

22

e. Depriving consumers of choices of purchasing crypto-currency form ATM machines free and open competition.

125.   The pro-competitive benefits, if any, of the market allocation agreements alleged above do not outweigh the anti-competitive effects of those agreements.

126.   The acquisition agreements unreasonably restrain trade in violation of the Cartwright Act.

127.   As a direct and proximate result of Defendants continuing violations of the Cartwright Act, USAG has suffered injury and damages in an amount to be proven at trial. These damages consist of having been cut out of highly lucrative agreements and being unable to compete in the crypto-ATM business but for the violations of the Cartwright Act.

128.   Under Business and Professions Code §16750(a), USAG seeks treble damages and attorneys' fees.

**SEVENTH CAUSE OF ACTION**

**Unreasonable Restraint of Trade in violation of the Cartwright Act**

**(Cal. Cal. Business and Professions Code §§16720, et seq.)**

**(Against Defendant NCR Corporation and DOES 1 – 25, inclusive)**

129.   USAG hereby repeats and incorporates by reference each paragraph herein as if fully stated herein.

130.   NCR has market power in the sale of cryptocurrency ATMs to individuals and groups in California and the USA.

131.   The NCR acquisition agreements with Cardtronics and NCR are unreasonable restraints of trade, the purpose or effect of which is to restrain competition. The agreements  substantially lessen the competition and tending to create a monopoly. The acquisition agreements has had substantial and unreasonable anticompetitive effects in the relevant markets, including but not limited to:

a. Allowing NCR to set prices for crypto-ATM transactions since they are the only option for such purchases on an ATM, and the other alternatives require

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

FIRST AMENDED COMPLAINT

downloading an app and going through vigorous underwriting and wait times, while crypto-ATM transactions can occur in real time;

b. Unreasonably restricting price and cost competition among payments services and technology providers by limiting or preventing access to crypto-ATMs in competition with NCR since NCR and Cardtronics own most of the ATM machines in the county;

c. Unreasonably restricting the ability of payment service providers to offer to NCR's competitors or potential competitors reduced prices for services;

d. Depriving consumers of crypto ATM transactions of free and open competition.

132.   NCR's acquisition agreements are a trust, combination of capital, skill or acts by two or more persons, within the meaning of the Cartwright Act, with an anticompetitive effect of the restraint outweighing any beneficial effect on competition as stated above. Such restraint harmed Plaintiff and Defendants' conduct was a substantial factor in causing Plaintiffs harm and harm to the class she represents.

133.   The pro-competitive benefits, if any, of the NCR acquisition agreements do not outweigh the anti-competitive effects of the agreements.

134.   Together, the acquisition agreements with Cardtronics and LibertyX restrains trade in violation of Cartwright Act, §§16720, et seq., of the California Business and Professions Code.

135.   As a direct and proximate result of NCR's continuing violations of the Cartwright Act, USAG has suffered injury and damages in an amount to be proven at trial. These damages consist of having been cut out of highly lucrative agreements and being unable to compete in the crypto-ATM business but for the violations of the Cartwright Act.

136.   Under Business and Professions Code §16750(a), USAG seeks treble damages and attorneys' fees.

///

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

FIRST AMENDED COMPLAINT

# EIGHTH CAUSE OF ACTION

## Willful Acquisition and Maintenance of a Monopoly in the Relevant Market for Cryptocurrency ATM Services

### (Cal. Cal. Business and Professions Code §§16720, et seq.)

### (Against Defendant NCR Corporation and DOES 1 – 25, inclusive)

137.   USAG hereby repeats and incorporates by reference each paragraph herein as if fully stated herein.

138.   NCR has monopoly power in the full-service crypto-ATMs market in California. This monopoly power is evidenced by, among other things:

a. NCR's ability, upon information and belief, to set the prices for crypto-ATM transactions, control prices, and exclude competitors like USAG;

b. NCR's high market share of the crypto-ATMs market, including its increasing market share.

c. NCR has abused and continues to abuse its monopoly power in order to maintain and enhance its market dominance by unreasonably restraining trade, thus artificially inflating the rates and fees that it charges to consumers.

139.   NCR's conduct constitutes unlawful monopolization and is unlawful anti-competitive conduct in the relevant markets in violation of the §16727 of the Cartwright Act.

140.   As a direct and proximate result of NCR's continuing violations of the Cartwright Act, USAG has suffered injury and damages in an amount to be proven at trial. These damages consist of having been cut out of highly lucrative agreements and being unable to compete in the crypto-ATM business but for the violations of the Cartwright Act.

141.   Under Business and Professions Code §16750(a), USAG seeks treble damages and attorneys' fees.

///

///

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

25

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

### NINTH CAUSE OF ACTION

### Willful Attempted Acquisition and Maintenance of a Monopoly in the
### Relevant Market for Cryptocurrency ATM Services
### (Cal. Cal. Business and Professions Code §§16727)
### (Against Defendant NCR Corporation and DOES 1 – 25, inclusive)

142.  USAG hereby repeats and incorporates by reference each paragraph herein as if fully stated herein.

143.  NCR has acted with the specific intent to monopolize the relevant markets.

144.  There was and is a dangerous possibility that NCR will succeed in their attempt to monopolize the relevant markets because NCR already controls a large percentage of those markets. Further success by NCR in excluding competitors from those markets is an attempt to monopolize, or attempt to combine or conspire to monopolize, will confer a monopoly for NCR in violation of §16727 of the Cartwright Act.

145.  NCR's attempted monopolization of the relevant markets has harmed competition in those markets and has caused injury to USAG. USAG is unable to compete and consumers are injured by paying higher fees.

146.  USAG has been damaged as the result of NCR's attempted monopolization of the relevant markets and seek treble damages.

### TENTH CAUSE OF ACTION
### (Constructive Trust)

147.  USAG hereby repeats and incorporates by reference each paragraph herein as if fully stated herein.

148.  NCR has benefitted from its unlawful acts through the overpayments for Crypto Transactions and by capturing almost all of the ATM market of which other payment processing providers previously were able to compete.

149.  It would be inequitable for NCR to retain the benefit of these

overpayments and transaction fees that were taken from USAG and retained by Defendants.

150. By reason of its unlawful conduct, NCR must make restitution to USAG.

151. Further, any action which might have been taken by USAG to pursue administrative remedies would have been futile. In equity, NCR cannot retain the economic benefits derived from their improper conduct and should be ordered to pay restitution and prejudgment interest to USAG.

## ELEVENTH CAUSE OF ACTION

### Unlawful Monopoly or Attempt to Monopolize in the Relevant Market of Cryptocurrency ATM Services

### (Section 2, Sherman Antitrust Act, 15 U.S.C. §2)

### (Against Defendant NCR Corporation and DOES 1 – 25, inclusive)

152. USAG hereby repeats and incorporates by reference each paragraph herein as if fully stated herein.

153. Cryptocurrency ATMs in the United States is a relevant antitrust market and NCR has monopoly power in that market.

154. NCR willfully maintains an unlawful monopoly and/or attempts to unlawfully monopolize the cryptocurrency ATM market in the United States.

155. As set forth above, on or about January 2021, NCR combined and conspired with Cardtronics to monopolize the ATM market and expand its market power to dominate the highly lucrative cryptocurrency ATM market as "the world's #1 ATM provider."

156. NCR exclusionary and predatory conduct has foreclosed a substantial share of the ATM market owning near 70% of the ATM machines in the United States due to its acquisition of Cardtronics and having acquired LibertyX touted by NCR to be the leading cryptocurrency ATM services company in the United States.

157. NCR has the ability to easily maintain and expand its monopoly having already cornered the cryptocurrency ATM market by way of its dominant ATM market

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

share, monopoly-drive profits, and more recently, the financial backing of its trillion-dollar equity shareholder BlackRock.

158.   As set forth above, NCR's anticompetitive acts have had harmful effects on competition and consumers.

159.   The anticompetitive effects of NCR's predatory and monopolist conduct outweigh any procompetitive benefits in this niche market, or can be achieved through less restrict means.

160.   As a direct result of NCR's conduct, USAG has been severely damaged and seeks relief for all damages available as provided for under 15 U.S.C §15 including without limitation for treble damages in an amount to be proven at trial plus attorney fees and costs of suit.

**TWELFTH CAUSE OF ACTION**

**Acquisitions that Substantially Lessen Competition and Tend to Create a Monopoly in the Relevant Market of Cryptocurrency ATM Services**

**(Section 7, Clayton Antitrust Act, 15 U.S.C. §18)**

**(Against Defendant NCR Corporation and DOES 1 – 25, inclusive)**

161.   USAG hereby repeats and incorporates by reference each paragraph herein as if fully stated herein.

162.   NCR is engaged in, and its activities substantially affect, interstate commerce.  NCR is a publicly traded company and it is common knowledge that NCR is a key player in the ATM markets and digital banking industry both nationally and globally.

163.   NCR's recent acquisitions of Cardtronics and LibertyX have already, and more likely than not, lessen competition substantially, and tend to create a monopoly, in interstate trade and commerce in the relevant cryptocurrency markets, in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C §18.

164.   As set forth above, Cardtronics came to the acquisition as the world's largest non-bank operator and ATM payments processing software provider operating

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-6901

approximately 285,000 ATMS across four continents and approximately 200,00 ATMS in the United States.   LibertyX came to the acquisition as the leading cryptocurrency ATM and software provider in the United States.  Combined with NCR as the worlds #1 ATM provider, NCR's acquisitions not only tend to create a monopoly, NCR has cornered the ATM market in both conventional currency ATMs and cryptocurrency currency ATMs.

165.   Among other things, NCR's acquisitions have had and/or will have, the following effects on competition, customers, and consumers:

a)    conditioning sales on exclusive dealing;

b)    exclusive dealing to divide geographical markets;

c)    bundling of ATM services;

d)    reducing competition generally in the relevant market;

e)    eliminating significant present and future head-to-head competition in the relevant market;

f)    causing prices to rise for customers in the relevant market;

g)    causing prices to rise for consumers in the relevant market; and

h)    reducing competition over innovation and new product development.

166.   As a direct result of NCR's conduct, USAG has been severely damaged and seeks relief for all damages available as provided for under 15 U.S.C §15 including without limitation for treble damages in an amount to be proven at trial plus attorney fees, costs of suit.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff U.S. Alliance Group, Inc. prays for relief against Defendant NCR Corporation, and DOES 1 – 25, jointly and severally, as follows:

1.    For full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of their unfair business acts or practices, breach of contract and other violations of law;

2.    Adjudge and decree that NCR maintains an unlawful monopoly, or

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

attempts to monopolize the relevant market in violation of Section 2 of the Sherman Act, 15 U.S.C. §2;

3. Adjudge and decree that NCR acquisitions described herein violate Section 7 of the Clayton Act, 15 U.S.C. §18;

4. Enjoin NCR from continuing to engage in the anticompetitive and exclusionary practices described herein and from engaging in any other practices with the same purpose and effect as the challenged practices;

5. Enter any other preliminary or permanent relief necessary and appropriate to restore competitive conditions and to cure any anticompetitive harm in the markets affected by NCR's unlawful conduct;

6. For a prohibitory injunction requiring Defendants to cease and desist from engaging in unlawful business practices, and for a mandatory injunction requiring the immediate return of all of USAG's property;

7. For compensatory damages in excess of $13,000,000, and interest thereon, in an amount according to proof at trial;

8. For treble damages as provided for by law;

9. For punitive damages as provided for by law;

10. For attorney's fees and costs as provided for by law;

11. For prejudgment interest at the maximum legal rate as provided for by law; and

12. For such other and further relief as the Court may deem proper.

Dated: June 3, 2022                    GLOBAL LEGAL LAW FIRM


                                       By: */s/ James C. Huber*
                                            James C. Huber, Esq.
                                            Attorneys for Plaintiff,
                                            U.S. ALLIANCE GROUP, INC.

GLOBAL LEGAL LAW FIRM
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-9901

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**GLOBAL LEGAL LAW FIRM**
380 STEVENS AVENUE, SUITE 311
SOLANA BEACH, CA 92075
(888) 846-8901

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that on June 3, 2022, I caused to be electronically filed the foregoing document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail. electronic mail, or by other means permitted by the Court rules.

GLOBAL LEGAL LAW FIRM


By: */s/ James C. Huber*
      James C. Huber

FIRST AMENDED COMPLAINT